UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------- X
                            :
JUDY M. BATTAGLIA,                   :      **MEMORANDUM**
                            :      **DECISION AND ORDER**
                 Plaintiff,     :
                            :      11 Civ. 02045 (BMC)
         - against -            :
                            :
MICHAEL J. ASTRUE,          :
COMMISSIONER OF SOCIAL SECURITY,   :
                            :
                Defendant.    :
---------------------------------------------------------------- X

**COGAN**, District Judge.

      Plaintiff brings this action pursuant to the Social Security Act, 42 U.S.C. § 405(g),

seeking review of the Commissioner of Social Security's denial of her application for disability

insurance benefits. Plaintiff and the Commissioner have each moved for judgment on the

pleadings pursuant to Federal Rule of Civil Procedure 12(c). For the reasons set forth below,

plaintiff's motion is granted in part and denied in part, and the Commissioner's motion is denied.

The case is remanded for further proceedings consistent with this decision.

## BACKGROUND

      Plaintiff Judy M. Battaglia applied for Supplemental Security Income ("SSI") under Title

XVI of the Act and disability insurance benefits under Title II of the Act on October 11, 2006,

alleging disability due to chronic fatigue syndrome, fibromyalgia, thyroiditis, tempormandibular

joint disorder ("TMJ"), autoimmune deficiency, and attention deficit hyperactivity disorder. In

May 2007, the Social Security Administration ("the Administration") granted plaintiff's SSI

claim with disability beginning September 1, 2006, but denied plaintiff's claim for disability

insurance benefits because the record did not show that plaintiff was disabled prior to December

31, 2004, plaintiff's date last insured. On July 5, 2007, plaintiff requested a hearing before an

administrative law judge ("ALJ"), and she appeared with counsel before ALJ David Z. Nisnewitz on February 11, 2009. On April 20, 2009, the ALJ denied plaintiff's claim for disability insurance benefits. On June 19, 2009, plaintiff filed an appeal, which the Appeals Council denied on February 25, 2011. This action followed.

**I. Non-Medical Facts**

Plaintiff is fifty-two years old. She allegedly has suffered from fibromyalgia and chronic fatigue syndrome since the age of two, and currently lives in Middle Village, New York in an apartment with two roommates. Plaintiff cooks her own meals, performs household chores, and takes public transportation. She has never married, has no children or surviving parents, has lost all communication with her siblings, and partakes in no social activity outside of interacting with her roommates and her doctors.

After graduating from college in 1983, plaintiff received a certificate in secretarial and computer training from a trade school. From September 1993 through May 1994, plaintiff worked as an administrative assistant at National Geographic, where she performed administrative work and supervised five support staff. From 1994 through 1999, plaintiff worked at Morgan Stanley as an administrative assistant, where she performed letter writing, typing, and filing tasks. In June 1999, plaintiff was fired from Morgan Stanley because she had "collapsed" and "couldn't keep up" at work. Plaintiff collected unemployment benefits for six months, and testified that she could not remember whether she had searched for other employment following her termination.

**II. Medical Evidence**

Plaintiff was diagnosed with fibromyalgia, chronic fatigue syndrome, and TMJ in the 1990s, and received treatment for these conditions while working for National Geographic and

2

Morgan Stanley. In 1995 and 1996, Dr. Howard Bezoza (an internist) and Dr. Gary Ostrow (a musculoskeletal osteopathologist) recommended that plaintiff refrain from sitting for prolonged periods of time due to her chronic fatigue syndrome and fibromyalgia. She was treated with anti-inflammatory medications and participated in a physical therapy program. Nevertheless, she maintained her employment as an administrative assistant, earning approximately $35,000 in 1995 and $37,000 in 1996.

Beginning after her termination from Morgan Stanley in 1999 through May 5, 2002, plaintiff regularly obtained medical care for her TMJ from Dr. Gelb at the Elmhurst Hospital Center. Treatment notes from July 11, 2000 state that plaintiff was doing "very well" and was "comfortable," with "no pain or discomfort."[1] In 2002, plaintiff began to see Dr. Omar Suarez for, among other things, her myofascial pain. In 2003, Dr. Suarez recommended that plaintiff see a rheumatologist, and plaintiff met with Dr. Jeffrey Greenberg at the NYU Medical Center Hospital for Joint Diseases in February of that year.

Plaintiff sought treatment from Dr. Greenberg from 2003 through 2005. At her initial examination, plaintiff reported low back pain radiating down her legs and feet, and an energy level of two out of ten. Upon examination, Dr. Greenberg found full ranges of motion in plaintiff's joints, and eight tender points.[2] Dr. Greenberg diagnosed plaintiff with fibromyalgia, TMJ, and thyroid disorder. Upon Dr. Greenberg's recommendation, plaintiff also saw endocrinologists regarding her thyroid at New York Presbyterian Hospital's endocrinology

---

[1] Plaintiff testified at the hearing that she did not seek medical care during this period.

[2] According to the American College of Rheumatology guidelines, the existence of at least eleven of eighteen specified tender points may be used to support a diagnosis of fibromyalgia. See Green-Younger v. Barnhart, 335 F.3d 99, 107 (2d Cir. 2003). Although Dr. Greenberg noted only eight tender points during his initial examination of plaintiff, he identified fourteen tender points on August 11, 2005, approximately eight months after plaintiff's date last insured.

division and at Elmhurst Hospital Center, where she received medication for autoimmune thyroid disease and was diagnosed with Graves' disease.

In March 2003, Dr. Greenberg prescribed plaintiff low dosages of Prednisone, which caused plaintiff's energy level to increase to a seven out of ten and her pain to decrease to two out of ten (from an earlier eight out of ten) by her next visit about one month later. Dr. Greenberg reported that plaintiff "has not felt this much energy and well[-]being in [the] last few years." X-rays of plaintiff's spine showed levo-convex scoliosis and preserved vertebral body height and disc spaces. Plaintiff's blood tests were negative for rheumatoid factor.

Plaintiff continued to visit Dr. Greenberg approximately every two to three months throughout 2003 and 2004. On July 7, 2003, Dr. Greenberg instructed plaintiff to taper off Prednisone and to begin taking Plaquenil. He also noted that plaintiff's fibromyalgia had improved and that she reported improved energy and decreased pain while on medication. Similarly, on September 13, 2003, Dr. Greenberg reported that plaintiff's fatigue was better and that she had switched from Prednisone to Plaquenil. On May 20, 2004, Dr. Greenberg noted that Plaquenil provided plaintiff "with months of relief," but that plaintiff experienced increased pain when her prescription ran out during the preceding week. Plaintiff reported to the nurse that this pain was severe and constant. Finally, on October 14, 2004, plaintiff visited Dr. Greenberg and complained of nausea for the past five months. She had no abdominal pain or fevers, she had "no substantial pain complaints," her lab results were within normal limits, and her energy level was "OK."

Plaintiff also received treatment from other doctors during the relevant period, including Dr. Reddy from NYU Medical Center Hospital for Joint Diseases and doctors from Elmhurst Medical Center. On December 11, 2003, plaintiff was treated at the Elmhurst infectious disease

4

clinic. Treatment notes indicate that plaintiff stated multiple complaints, that infectious causes were unlikely, and that the hospital should rule out anxiety disorder versus chronic fatigue syndrome. On July 18, 2004, plaintiff was treated at Elmhurst's endocrinology clinic with complaints of pain, insomnia, and problems with memory. Finally, Dr. Reddy examined plaintiff on September 23, 2004 and found some possibly decreased range of motion in her shoulders and wrists, as well as diffuse tenderness to palpitation. She noted that plaintiff showed "very good clinical imp[rovement] of symptoms" and that plaintiff's fibromyalgia was "doing well." Also, while taking note of plaintiff's concern that her condition may "flare w[ith] season change," Dr. Reddy observed that plaintiff "feels imp[rovement]" since her last visit in May 2004 and "feels almost ready to return to go back to work."

Apart from these reports, plaintiff's physicians also wrote a series of letters (mostly handwritten) describing plaintiff's conditions and complaints. Within the relevant period, Dr. Greenberg wrote three such letters. The first, dated July 3, 2003, states that "[i]n the past six weeks, [plaintiff] has had problems with her medication adjustments, which has caused her fibromyalgia to worsen," and that plaintiff "has been experiencing severe fatigue and pain." The second, dated September 11, 2003, states that plaintiff "has been having acute pain and exhaustion, causing difficulty functioning." In the final letter, dated May 20, 2004, Dr. Greenberg wrote that plaintiff "has been disabled with loss of ability to function in her normal manner," but that she is "determined to get better" and that "she has improved."

Additionally, Dr. Greenberg wrote an undated letter describing his treatment history with plaintiff between 2003 and 2005.[3] In that letter, Dr. Greenberg notes that plaintiff "suffered from acute pain and exhaustion," was "easily exhausted after physical exertion," and that she

---

[3] Although the ALJ questioned the evidentiary value of this undated medical opinion, the ALJ admitted the letter into evidence.

"relapsed after physical or emotional stresses, seasonal changes, or illness." Dr. Greenberg also noted that plaintiff complained of "anxiety and depression" due to her inability to find a "good" endocrinologist or "good" thyroid care. The letter indicates that Dr. Greenberg treated plaintiff with Zoloft, Prednisone, and Plaquenil, and that plaintiff was "very slow to recover." Dr. Greenberg concluded that plaintiff "had not worked in years and could not have maintained gainful employment during this time of treatment."

Dr. Yoo and Dr. Chen wrote similar letters. In October 2003, Dr. Yoo saw plaintiff for the first time and noted in a handwritten letter that plaintiff had tremendous problems and complaints, is being treated for fibromyalgia, and could not work at the time due to her fatigue and pain. In December 2003, Dr. Chen wrote that plaintiff had fibromyalgia, was taking medication for her pain and feels some improvement, that she required three more months of treatment to enhance its effect, and that plaintiff's symptoms impeded her ability to work at that time. Six months later, Dr. Chen wrote that plaintiff's condition showed some improvement and that she could hopefully return to work by the end of the year.

### III. Psychiatric Evidence

Following her termination from Morgan Stanley, plaintiff complained of depression and sought psychiatric care at Elmhurst Hospital Center in December 2003. There, therapist Woods noted in his intake interview on December 18, 2003, that plaintiff appeared well-nourished, well-groomed, cooperative, and without thought disorder, but that she was "preoccupied with health and finances." He further noted that she had normal speech, fair judgment and insight, and was without suicidal ideation or delusion, but that she had an anxious mood and an inappropriate affect. He diagnosed general anxiety disorder.

6

On January 12 and 14, 2004, plaintiff saw Dr. Aneselovita and therapists Woods, respectively. During these sessions, plaintiff complained of hypersomnia, low interest, and low energy, but was motivated to accomplish the goals of treatment. At the next session on January 21, 2004, Dr. Aneselovita reported that plaintiff appeared neat, clean, and maintained good eye contact, noting that plaintiff denied having depression or anxiety, but complained about her physical ailments and stated that she suffered from obsessive-compulsive disorder. Plaintiff had a final visit with Woods on January 26, 2004, and missed her February appointment. Elmhurst discharged plaintiff in May 2004 due to her six months of unexplained absence.

## IV. Social Security Proceedings

After requesting and receiving an adjournment of her originally scheduled hearing, plaintiff appeared before the ALJ on February 9, 2009. At the hearing, she testified that following her termination from Morgan Stanley in 1999, she "fell like a sack of flour" and remained bedridden, dressing "a couple times a week" and unable to "do anything." During this period, she suffered from widespread pain, dizzy spells, mental breakdowns, and "exhaustion that was beyond anything." This "black period" concluded in 2003, but plaintiff testified that she continued to suffer from daily headaches as a result of her TMJ, neck pain, prolonged dizzy spells that are aggravated by the weather, and widespread pain and exhaustion.

Plaintiff further testified that in 2003 she started seeing Dr. Greenberg, who diagnosed her with fibromyalgia, recommended that she see an endocrinologist, and prescribed her medication. Plaintiff noted that she did not believe her visits to the endocrinologists did much, but that Dr. Greenberg, the only doctor plaintiff testified as seeing regularly during this period, helped her cope by putting her on Plaquenil. Plaintiff testified that Plaquenil helped "a lot" and that her "energy definitely got better" while taking that medication.

7

Dr. Plotz, a rheumatologist internist and the appointed impartial medical expert, also testified as to plaintiff's medical condition. Dr. Plotz had received the bulk of plaintiff's medical file at the beginning of the hearing, as plaintiff had sent this evidence to the Commissioner less than one week prior. He stated that "it really wouldn't be fair to the claimant for me to try to read [plaintiff's medical file] hastily," to which the ALJ responded by expressing his reservations about rescheduling the hearing. The ALJ resolved the issue by instructing Dr. Plotz to review as much as he could before he gave his testimony, and to review the file in greater detail after the hearing and inform the ALJ if his opinion changed. The ALJ further offered plaintiff the opportunity to send Dr. Plotz interrogatories once the he had completed this review. The record does not indicate any subsequent communication between Dr. Plotz and the ALJ or plaintiff, and plaintiff concedes that she never inquired into the matter or sent Dr. Plotz interrogatories.

Dr. Plotz testified at the hearing that plaintiff fit the classic pattern of what he called "blurred diseases," but that plaintiff did not have a classic picture of fibromyalgia. He noted that the record contains no physical findings or laboratory tests that might explain plaintiff's complaints of fatigue and pain, and that plaintiff likely suffers from anxiety and depression. Overall, he concluded that plaintiff's medical conditions did not meet any of the listings in Appendix 1 and that plaintiff could stand and walk six hours in a day, had no limitation on sitting, and could lift and carry up to twenty pounds. Plaintiff's counsel did not cross-examine Dr. Plotz as to plaintiff's physical capabilities, but did question him on plaintiff's alleged psychiatric condition. After informing plaintiff's counsel that he was not a psychiatrist, Dr. Plotz opined that plaintiff had "moderate" psychiatric problems, including obsessive compulsive disorder. During this exchange, plaintiff's counsel requested that plaintiff be sent for a

8

psychiatric examination to determine whether her condition was disabling during the relevant period, which the ALJ took under consideration but ultimately rejected.

Finally, vocational expert Andrew Pasternak testified that plaintiff worked as an "administrative assistant" at Morgan Stanley, which he classified as sedentary work.

**V. ALJ's Disability Determination**

By written decision dated April 20, 2009, the ALJ concluded that plaintiff was not disabled within the meaning of the Act during the relevant period. The ALJ determined that plaintiff's fibromyalgia and thyroiditis were severe medically-determinable physical impairments, but that plaintiff retained the physical ability to perform her past relevant work as an administrative assistant and office manager. In reaching this conclusion, the ALJ found that although plaintiff's fibromyalgia could reasonably be expected to produce plaintiff's chronic pain and headaches, the severity of plaintiff's subjective accounts of pain were not credible or otherwise supported by objective medical evidence. The ALJ supported this conclusion by noting plaintiff's ability to continue performing her physical chores throughout the relevant period, that she was not under medical care from 1999 through 2002 despite her professed medical condition, and that plaintiff's physicians' reports indicated that plaintiff's condition was controlled by her medications, that she showed very good clinical improvements since beginning her treatment in 2003, and that there was no objective diagnostic evidence of musculoskeletal abnormalities. Finally, the ALJ noted that the only abnormal lab results concerned plaintiff's thyroid levels, which were controlled by medication, and that there was no evidence of end organ damages as a result of plaintiff's thyroiditis.

In reaching this conclusion, the ALJ gave no weight to the opinions of certain of plaintiff's doctors. First, the ALJ disregarded Dr. Greenberg's opinion that plaintiff "could not

9

have maintained employment during [the relevant] period," which was offered in an undated, one-page letter. The ALJ did so because this opinion "did not provide any clinical treatment notes," did not provide a "function by function assessment of [plaintiff's] physical capacity," and because "an opinion regarding the claimant's inability to work is a decision reserved to the [ALJ] in determining the claimant's disability." The ALJ similarly afforded no weight to various medical notes written by Drs. Ellen Blye, Howard Bezoza, and Gary Ostrow in the mid-1990s. The ALJ based this decision on the fact that each opinion was written for the purpose of excusing plaintiff from jury duty and did not provide any clinical evidence of disability. Further, Dr. Blye's letter did not provide a diagnosis, Dr. Bezoza's letter did not provide a physical assessment, and Dr. Ostrow's opinion that plaintiff would have difficulty with prolonged sitting was contradicted by the fact that plaintiff was working as an administrative assistant at the time.

With respect to plaintiff's mental impairments, the ALJ acknowledged their alleged existence but concluded that they had "no more than a minimal effect on her ability to do basic work activities." In support of his conclusion, the ALJ relied on plaintiff's psychological evaluations, the fact that she stopped seeing her psychiatrist after three sessions, and the fact that plaintiff was never prescribed psychotropic medication.

## DISCUSSION

### I. Legal Framework and Standard of Review

A district court may set aside the Commissioner's determination that a claimant is not disabled in a social security case if the Commissioner failed to apply the correct legal standards or if the factual findings are not supported by substantial evidence. See 42 U.S.C. § 405(g); Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998). "The former determination requires the court to ask whether "the claimant has had a full hearing under the [Commissioner's] regulations and

10

in accordance with the beneficent purposes of the Act." Echevarria v. Sec'y of Health & Human Servs., 685 F.2d 751, 755 (2d Cir. 1982) (internal quotation marks omitted). The latter determination requires the court to ask whether the decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420 (1971) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229, 59 S. Ct. 206 (1938)).

A claimant is "disabled" under Title II if she is unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). The impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." See id. § 423(d)(2)(A).

"The burden of proving disability is on the claimant," Mimms v. Heckler, 750 F.2d 180, 185 (2d Cir. 1984), and the ALJ retains sole responsibility for determining whether a plaintiff is "disabled" under the Act. See 20 C.F.R. § 404.1527(e)(1); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999). Nevertheless, in weighing the medical evidence, the ALJ is obligated to adhere to the rules set forth in 20 C.F.R. § 416.927(d), which requires that the Commissioner give a treating physician's opinion "controlling weight" if her opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 416.927(d)(2); see also Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008). Such "clinical and diagnostic techniques" include a patient's reports or complaints. See Burgess, 537 F.3d at 128.

11

An ALJ who declines to give controlling weight to a treating physician's medical opinions must give "good reasons" for his decision based on various factors, including: "(i) the frequency of the examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors." Schaal v. Apfel, 134 F.3d 496, 503–04 (2d Cir. 1998); see also 20 C.F.R. § 404.1527(d). Although an ALJ need not discuss each of these factors explicitly, it must be clear from his decision that he "'applied the substance of the treating physician rule.'" Callanan v. Astrue, No. 10-CV-1717, 2011 U.S. Dist. LEXIS 13103, at *8 (E.D.N.Y. Feb. 10, 2011) (quoting Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004)).

An ALJ may not, however, reject a treating physician's opinion merely because supporting clinical or diagnostic evidence is not in the record. See Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999). This is true regardless of whether a plaintiff is represented by counsel. See id.; Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996). Unlike trial judges, ALJs have an affirmative duty to develop a complete medical record before making a disability determination, in light of the non-adversarial nature of benefits proceedings. See Burgess, 537 F.3d at 128; Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999); Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996). Nevertheless, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." Rosa, 168 F.3d at 79 n.5 (quoting Perez, 77 F.3d at 47).

## II. Duty to Develop the Record

Plaintiff alleges numerous examples of procedural error in this case, but the argument that holds the most traction is plaintiff's assertion that the ALJ failed in his duty to develop plaintiff's medical record. Specifically, plaintiff notes that none of her treating physicians "seemed to have been asked" whether she could have actually performed her past work. I interpret this statement as a contention that the ALJ erred by neglecting to obtain medical source statements from plaintiff's treating doctors.[4] After a careful review of plaintiff's administrative file, I have been unable to find a medical source statement addressing plaintiff's abilities during the relevant period, nor have I found any evidence to suggest that the ALJ or the Administration requested such statements. I therefore agree with plaintiff, and find that the ALJ's failure to request medical source statements requires remand of this case for three reasons.

First, district courts within this Circuit have routinely recognized that ALJs have an affirmative duty to request medical source statements from a plaintiff's treating sources in order to develop the record, regardless of whether a plaintiff's medical record otherwise appears complete. See, e.g., Stokes v. Astrue, No. 7:10-CV-1129, 2012 U.S. Dist. LEXIS 27016, at *28-33 (N.D.N.Y. Mar. 1, 2012); Funk v. Astrue, No. 10-CV-602, 2012 U.S. Dist. LEXIS 18867, at *11-13 (N.D.N.Y. Feb. 15, 2012); Johnson v. Astrue, 811 F. Supp. 2d 618, 630-31 (E.D.N.Y. 2011); Robins v. Astrue, No. CV-10-3218, 2011 U.S. Dist. LEXIS 63145, at *8-9 (E.D.N.Y. June 15, 2011). This conclusion is grounded in the regulations themselves, which provide that the Commissioner will make every reasonable effort to obtain medical reports from a claimant's medical sources, including a statement about the claimant's capabilities in light of her

---

[4] A medical source statement is a medical opinion concerning "an individual's physical or mental ability to perform work-related activities on a sustained bases." Social Security Ruling 96-5p, Policy Interpretation Ruling Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner, 1996 SSR Lexis 2, at *11 (July 2, 1996); see also 20 C.F.R. § 404.1512(b)-(c).

impairments.  See 20 C.F.R. § 404.1512; id. § 404.1513(b)(6).  Moreover, Social Security Ruling

96-5p provides that "[a]djudicators are generally required to request that acceptable medical

sources provide [medical source] statements with their medical reports," 1996 SSR Lexis 2, at

*11, and such rulings are binding on ALJs.  See 20 C.F.R. § 402.35(b)(2); Robins, 2011 U.S.

Dist. LEXIS 63145, at *9.  Thus, the law is clear that the ALJ was required to request such

statements from plaintiff's treating physicians before concluding that plaintiff was not disabled.

By neglecting to do so, he reached a disability determination on an incomplete record.[5]

     Although this failure is sufficient to require remand by itself, the ALJ further

compounded the prejudice to plaintiff by affording no weight to the opinion letter of Dr.

Greenberg in part because it did not include a function-by-function assessment of plaintiff's

physical capacity.  This was of course factually correct, but it was also improper.  Dr. Greenberg

may very well have not understood how to best communicate to the Administration his belief

that plaintiff was disabled, and it is for this reason that ALJs have a duty to request that a treating

source provide a functional assessment.  See Rosa, 168 F.3d at 80.  Having failed to do so, the

ALJ committed error by using the absence of such an assessment as a reason for disregarding Dr.

Greenberg's opinion.[6]

---

[5] This conclusion is bolstered by the oft-quoted passage in Peed v. Sullivan, 778 F. Supp. 1241 (E.D.N.Y. 1991), in which Judge Glasser explained the value of a treating physician's opinion.  "[W]hat distinguishes [a treating physician] from the examining physician and from the ALJ," explained Judge Glasser, "is his opportunity to develop an informed opinion as to the physical status of a patient.  To obtain from a treating physician nothing more than charts and laboratory test results is to undermine the distinctive quality of the treating physician that makes his evidence so much more reliable than that of an examining physician . . . .  It is the opinion of the treating physician that is to be sought; it is his opinion as to the existence and severity of a disability that is to be given deference." 778 F. Supp. 1241, 1246.

[6] Plaintiff's attorney of course could have and should have either asked Dr. Greenberg to provide a functional analysis, or requested that the Administration provide Dr. Greenberg with an assessment form.  Her attorney's failure to do so is but one example of his lack of diligence, which is readily apparent throughout plaintiff's administrative file.  Nevertheless, the ALJ bears an independent duty to reach a disability determination on a complete record, even where a plaintiff is represented by counsel.  See Rosa, 168 F.3d at 79; Perez, 77 F.3d at 47.

14

Admittedly, the ALJ also declined to afford any weight to Dr. Greenberg's opinion that plaintiff "could not have maintained gainful employment" on the ground that this opinion is a conclusion on the ultimate issue of disability. This was a proper consideration, as the ALJ is not required to give controlling weight to a treating physician's opinion regarding a plaintiff's disability status. See 20 C.F.R. § 404.1527(e)(1); Snell, 177 F.3d at 133. However, that the ALJ was not required to give Dr. Greenberg's opinion controlling weight does not negate the fact that he relied on an impermissible factor in deciding to give the opinion no weight. In any event, Dr. Greenberg's opinion that plaintiff was disabled at the very least highlights the potential prejudice to plaintiff from the failure of the ALJ to request his medical source statement. Without such an assessment, the ALJ and this Court can only speculate as to Dr. Greenberg's opinion regarding plaintiff's ability to perform specific functions.[7]

Third, medical source statements would have been particularly significant in this case in light of the fact that plaintiff's primary impairment during the relevant period was fibromyalgia. As the Second Circuit explained in Green-Younger v. Barnhart, 335 F.3d 99, 108 (2d Cir. 2003), fibromyalgia is a "disease that eludes [objective] measurement." Thus, the only clinical diagnostic techniques that could have been expected to support a finding of disability were a positive tender point test, plaintiff's subjective complaints of pain and fatigue, and her treating physician's determination as to the severity of her impairments and her ability to function. See id. at 106-07. The record is clear that plaintiff complained of debilitating pain and exhaustion (at

---

[7] This opinion is not Dr. Greenberg's only opinion regarding the relevant period in the record. He wrote on September 11, 2003, that plaintiff "has been having acute pain [and] exhaustion, causing difficulty functioning," and on May 20, 2004, that plaintiff has suffered a "loss of ability to function in her usual manner." Although these statements undoubtedly blur the line between a doctor's opinion and a recounting of plaintiff's complaints, the ALJ should have considered them in light of the fact that medical opinions frequently incorporate a patient's reports, particularly when the patient is suffering from a disease like fibromyalgia. On remand, the ALJ must consider in his disability determination these opinions, as well as the opinions of Drs. Chen and Yoo, and provide good reasons for the weight he assigns to them. See Lunan v. Barnhart, No. 01-CV-424, 2003 U.S. Dist. LEXIS 22891, at *12-13 (N.D.N.Y. Dec. 4, 2003).

least at times), and although the results of her tender point tests varied, everyone, including the ALJ, accepted that plaintiff had fibromyalgia. Thus, the opinions of plaintiff's treating physicians were a critical missing piece in her claim of disability.

I do note, however, that the ALJ's decision demonstrates that he carefully considered plaintiff's conditions and her complaints of pain, recognizing that she suffered from fibromyalgia and thyroiditis and that these impairments were severe. He also quite reasonably found that several treatment notes indicate that plaintiff was responding well to medication and undermine her complaints as to the severity of her pain and fatigue. However, the majority of these treatment notes provide relative characterizations of plaintiff's symptoms, e.g., that she was feeling improved energy and decreased pain. Such statements can easily be misinterpreted, particularly considering that plaintiff claimed that she had previously suffered from such debilitating pain and exhaustion that she could not get out of bed for three years. Without even attempting to obtain an opinion from any of plaintiff's treating physicians regarding plaintiff's functional abilities, it was not fair for the ALJ to seize upon these treatment notes as evidence that plaintiff in fact could have performed her past relevant work. Remand is therefore required here.

### III. Dr. Plotz's Review of Plaintiff's Medical Record

Plaintiff's next point of contention is that she was prejudiced as a result of Dr. Plotz's failure to review her medical records prior to her hearing. She specifically notes that she was unfairly prevented from cross-examining Dr. Plotz on her psychological impairments and on her chronic fatigue syndrome. I am not persuaded that plaintiff was prejudiced in either of the ways she contends. However, as I explain in greater detail below, plaintiff must be afforded a new hearing on remand.

16

With regard to plaintiff's arguments, the record indicates that she had ample opportunity to cross-examine Dr. Plotz on his opinion as to plaintiff's mental impairments, and her attorney in fact did so. Further, Dr. Plotz was sufficiently prepared to provide this opinion and field questions. He stated unequivocally that he had reviewed plaintiff's psychiatric treatment records prior to testifying, and these records were a relatively small part of plaintiff's file. He also stated that plaintiff likely suffered from obsessive compulsive disorder and that her mental impairments were moderate. Thus, plaintiff's argument that Dr. Plotz was unprepared for cross-examination or that she was unfairly prevented from cross-examining him regarding plaintiff's psychological impairments is meritless.

Additionally, plaintiff concedes in her motion that her attorney did not cross-examine Dr. Plotz on her chronic fatigue syndrome because the attorney had not realized that plaintiff had been found to be disabled as a result of that condition as of September 2006. Thus, it was counsel's lack of preparation, not Dr. Plotz's, that inhibited plaintiff's cross-examination with regard to this impairment.[8]

Nevertheless, I am concerned by the procedure employed by the ALJ after he learned that, due to plaintiff's last-minute submission of voluminous records, Dr. Plotz had reviewed only a small portion of plaintiff's medical evidence prior to the hearing. To remedy this problem, the ALJ instructed Dr. Plotz to review plaintiff's file as best he could during the hearing, to review the file more thoroughly after the hearing, and to update the parties if his opinion changed. The ALJ further offered plaintiff the opportunity to send Dr. Plotz interrogatories based on any supplemental opinion he offered, and plaintiff accepted this

---

[8] Notably, plaintiff's attorney elected not to cross-examine Dr. Plotz on any of plaintiff's physical impairments, despite the fact that Dr. Plotz testified about plaintiff's fibromyalgia and chronic fatigue syndrome and opined that she retained the ability to perform light work.

proposal. But plaintiff contends that she never heard anything more from either Dr. Plotz or the ALJ, and therefore did not send interrogatories.[9] Moreover, there is no evidence in the record that Dr. Plotz conducted any additional review of plaintiff's medical evidence to confirm that his prior testimony was accurate.[10]

This procedure may well have been appropriate and sufficient as proposed. However, I cannot endorse it here as a result of the lack of clarity in the record. The ALJ should have ensured that Dr. Plotz completed his review of plaintiff's medical records, informed plaintiff of this fact, and included this correspondence in plaintiff's administrative file. Because he did not do so, I cannot determine whether it was reasonable to credit Dr. Plotz's testimony, or conclude that plaintiff received the fair hearing to which she was entitled. Thus, plaintiff must have the opportunity to appear before the ALJ once more, and to have a disability determination based on testimony from a medical expert that has reviewed her record in full.

**IV. Psychiatric Consultative Examination**

Plaintiff also argues that the ALJ failed to develop the record with regard to her alleged psychological disability by refusing to order a psychiatric consultative examination. According to plaintiff, such an examination was necessary in light of the evidence suggesting that she suffered from mental illness during the relevant period. She specifically identifies as support her psychiatric treatment at Elmhurst Hospital, her Zoloft prescription from Dr. Greenberg, and Dr. Plotz's comments during the hearing that she had moderate psychological problems.

Under the Social Security regulations, an ALJ typically has discretion in determining whether to order a consultative examination. See 20 C.F.R. § 404.1517; Hughes v. Apfel, 992 F.

---

[9] Plaintiff also made no effort to contact either the ALJ or Dr. Plotz.

[10] Dr. Plotz did testify that he had finished his review of the record at the hearing, but plaintiff's medical records are nearly one thousand pages.

Supp. 243, 248 (W.D.N.Y. 1997). However, when the facts suggest that such an examination is necessary to resolve a "conflict, inconsistency, ambiguity, or insufficiency in the evidence," the ALJ must order the examination in order to fulfill his duty to develop the record. See Lefever v. Astrue, No. 5:07-CV-622, 2010 U.S. Dist. LEXIS 103777, at 20-21 (N.D.N.Y. Sep. 30, 2010); Hughes, 992 F. Supp. at 248. Based on the circumstances of this case and the psychiatric evidence in the record, the ALJ properly concluded that a consultative examination was not necessary here.

As an initial matter, the ALJ correctly noted during the hearing that ordering a psychiatric examination five years after plaintiff's date last insured would not be particularly probative of her allegedly disabling mental condition during the relevant period. Moreover, the evidence concerning plaintiff's mental health was not in conflict, inconsistent, ambiguous, or insufficient for the ALJ to make a disability determination. As previously noted, psychiatric records from Elmhurst Hospital showed that plaintiff at times complained of anxiety and depression and was diagnosed with general anxiety disorder, but she was well-nourished, well-groomed, and showed no evidence of thought disorder or psychosis. These impressions are consistent both with the treatment notes of Dr. Greenberg and with plaintiff's intermittent use of Zoloft and Paxil. Additionally, as noted by the ALJ and as discussed above, plaintiff voluntarily discontinued her psychiatric treatment at Elmhurst – her only mental health treatment during the relevant period – shortly after her first visit. In light of these facts, the ALJ was not required to order a consultative psychiatric examination in order to fully develop the record. [11]

---

[11] Plaintiff also argues that the ALJ should have requested a retrospective assessment of plaintiff's psychological impairments. However, an ALJ is not required to obtain retrospective assessments where the plaintiff has not identified a treating physician prepared to offer such an assessment and indicated that a retrospective assessment would reveal any useful information. See Perez, 77 F.3d at 48; cf. Pino v. Astrue, No. 09 Civ. 3465, 2011 U.S. Dist. LEXIS 23237, at *69 (S.D.N.Y. Feb. 8, 2011) (holding that the ALJ erred by failing to recontact plaintiff's treating psychiatrist after plaintiff requested that the ALJ do so and indicated that the psychiatrist would provide a

## V. Alleged Bias

Plaintiff's next contention is that the ALJ's "patent bias" prevented her from receiving a fair hearing and a disability determination based on a fully developed record. Additionally, she requests that in the event her case is remanded, that it be remanded to a different ALJ. Because I have already found that the record was not fully developed and that remand is required, I focus on plaintiff's request that I remand her case to a new ALJ.

The assignment of a disability claim to a different ALJ on remand is a decision ordinarily left to the discretion of the Commissioner. See Sutherland v. Barnhart, 322 F. Supp. 2d 282, 292 (E.D.N.Y. 2004). However, in extreme circumstances, the conduct of an ALJ may give rise to "serious concerns about the fundamental fairness of the disability review process," in which case remanding the case to a new ALJ is appropriate. See id. Examples of scenarios in which a serious concern may arise include when there is: (1) a clear indication that the ALJ will not apply the appropriate legal standard; (2) a clearly manifested bias or inappropriate hostility toward any party; (3) a clearly apparent refusal to consider portions of the testimony or evidence favorable to a party; or (4) a refusal to weigh or consider evidence with impartiality. See Valet v. Astrue, No. 10-CV-3282, 2012 U.S. Dist. LEXIS 7315, at *68-69 (E.D.N.Y. Jan. 23, 2012); Sutherland, 322 F. Supp. 2d at 292.

Applying this standard to the instant case, I find that remanding plaintiff's disability claim to a new ALJ is not warranted. Plaintiff cites as examples of bias the ALJ's allegedly aggressive questioning style, his repeated interruptions of her testimony and her counsel's cross-examination of Dr. Plotz, and his frustration with plaintiff's attempt to offer Dr. Greenberg's undated letter into evidence. However, I have reviewed the transcript and find that the ALJ's

---

retrospective assessment). Because plaintiff did neither of these things, the ALJ did not fail to develop the record with regard to plaintiff's mental impairments.

questions and "interruptions" generally served to clarify the testimony and the issues to be decided, and did not demonstrate a clear bias or inability to adjudge plaintiff's disability claim fairly. Further, the ALJ eventually admitted Dr. Greenberg's undated letter into evidence, and merely opining on the propriety of submitting an undated medical opinion letter does not exhibit the "patent bias" plaintiff alleges. Cf. Liteky v. United States, 510 U.S. 540, 555-56 (1994). Thus, I leave it to the Commissioner to determine the assignment of plaintiff's case on remand.[12]

## CONCLUSION

For the foregoing reasons, defendant's motion for judgment on the pleadings is denied, and plaintiff's motion is granted in part and denied in part. The case is remanded to the Commissioner for further administrative proceedings consistent with this decision.

**SO ORDERED.**

s/ BMC

U.S.D.J.

Dated: Brooklyn, New York
      May 25, 2012

---

[12] I have considered plaintiff's remaining allegations of procedural error and find them to be without merit.